## SUPPLY AND SERVICES AGREEMENT

This Supply and Services Agreement (the "**Agreement**") made as of the 26th day of July, 2011, by and between Eran Industries Ltd, a Hong Kong limited liability corporation having an address 17th/f Guangbo Mansion 1357 Yinxian Avenue Ningbo, China 315100 (the "**Manufacturer**"), and Eran Financial Services LLC, a Florida limited liability company having its principal place of business c/o Esposito, Fuchs, Taormina & Company, Accountants and Business Consultants, 267 Carleton Avenue, Suite 202, Central Islip, New York 11722, Attn: Shai Levitin (the "**Purchaser**").

### W I T N E S S E T H:

WHEREAS, Manufacturer is in the business of manufacturing, producing, sourcing, purchasing, selling and distributing merchandise and products ("**Products**"); and

WHEREAS, Purchaser is engaged in the distribution and sale of Products; and

WHEREAS, the parties are desirous of documenting their respective rights and obligations;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and obligations of the parties contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, it is agreed as follows:

1. Term.

    1.1   The term of this Agreement shall commence as of the date hereof and, unless earlier terminated as provided herein, shall continue until December 31, 2021 (the "**Term**").

    1.2   Notwithstanding the foregoing, this Agreement shall terminate upon the occurrence of the dissolution, liquidation or other manner of termination of either party.

    1.3   Notwithstanding the foregoing, either party may terminate this Ageement on account of a material breach by the other party of its obligations hereunder by giving such other party at least thirty (30) days written notice which describes the reason for the termination. This Agreement terminates unless the party receiving notice cures the breach within the notice period. Circumstances supporting termination for cause include, without limitation, Manufacturer's failure to meet Product quality standards, production schedules or delivery dates set forth in the Purchase Orders.

    1.4   Purchaser may terminate this Agreement if the Manufacturer is unable to resume a significant portion of its operations within one hundred twenty (120) days of any of the following: fire, flood or other act of God, civil unrest, enemy action, epidemic, explosion, insurrection, riot, war, or government actions (each, a "**Force Majeure Event**").

    1.5   At termination (but excluding termination resulting from Manufacturer's uncured breach), both parties shall be obligated to comply with all purchase orders then in effect

{00538967.DOC;4 }

Exhibit A

and shipment terms will be as provided under this Agreement. If termination results from Manufacturer's uncured breach, Manufacturer shall, at Purchaser's option, sell and deliver these items to Purchaser on the terms described above.

2. Orders

2.1 General. Provided that Purchaser is not in uncured breach of its obligations hereunder, Manufacturer shall manufacture and supply to Purchaser all Products ordered by Purchaser. Upon receiving an order from the Purchaser the Manufacturer shall promptly notify the Purchaser in writing whether it is accepting or rejecting an order; provided however the Manufacturer must accept an order unless the Purchaser is in an uncured breach of its obligations hereunder; if the Purchaser does not receive a written notice indicating that the Manufacturer is rejecting an order within 10 days of its receipt of the order, Manufacturer shall be deemed to have accepted such order. Upon accepting an order for Products, Manufacturer shall produce such Products in accordance with such order (including quantity, delivery location and, if specified, delivery dates) and with the design and specifications applicable to such Products in a first quality workmanlike manner and in compliance with all applicable governmental regulations, and deliver same together with all appropriate packaging in a timely manner.

2.2 Direct Sales to Other Customers. The Manufacturer is authorized to sell Products to other customers but only for cash or with the prior written consent of the Purchaser.

3. Pricing. All Products to be sold to Purchaser by Manufacturer shall be sold for one hundred and ten percent (110%) of the Manufacturer's total costs, unless otherwise agreed in writing.

4. Payment. Purchaser shall pay Manufacturer for all Products sold and shipped to Purchaser and/or sold and shipped to others on the Purchaser's behalf (including, without limitation, to subsidiaries of the Purchaser), within sixty (60) days after Purchaser has received a copy of the original bill of lading, packing slip and invoice (collectively, an "**Invoice**") for such Products or the Purchaser and/or its designee has received delivery of such Products, whichever is later.

5. Delivery; Assurances; Force Majeure.

5.1 Delivery. Time is of the essence with respect to Manufacturer's obligations hereunder. Unless otherwise agreed to in writing by Purchaser, Products shall be FOB destination unless parties agree otherwise. Manufacturer shall be responsible for arranging and paying for all freight to Purchaser's place of business. Manufacturer shall strictly comply with delivery instructions (including the specified quantities and strict adherence to delivery schedule) contained in purchase orders. Manufacturer shall notify Purchaser promptly orally and thereafter in writing if it is unable to fulfill the terms of any such delivery. Such notification shall not relieve Manufacturer of any of its obligations, nor limit Purchaser's remedies with respect to Manufacturer's breach.

5.2 Assurances. If Purchaser reasonably determines at any time that Manufacturer's performance of its obligations in full compliance with this Agreement or any purchase order is in doubt, then Purchaser may require Manufacturer to provide it with written

{00538967.DOC;4 }

2

assurance stating that Manufacturer is able to perform all of its obligations under this Agreement and/or any purchase order. Such written assurance of performance shall be delivered by Manufacturer to no later than fifteen (15) days following Purchaser's request, and shall be accompanied by such written reports or other materials as Purchaser may reasonably request. If Manufacturer does not provide such written assurance of performance to Purchaser within fifteen (15) days following Purchaser's request, Purchaser may suspend all or any part of Purchaser's performance hereunder until Purchaser receives Manufacturer's written assurance of performance

5.3     Force Majeure. Subject to **Section 1.4**, Manufacturer's delay of delivery will be excused if Manufacturer provides written notice of any Force Majeure Event within three (3) business days of the occurrence of such Force Majeure Event, provided that the Manufacturer uses its reasonable best efforts to remove or overcome the effects of such occurrence at the earliest possible time. Manufacturer agrees to promptly give Purchaser a revised delivery schedule. If Manufacturer's production is only partially restricted or delayed, Manufacturer shall accommodate Purchaser's requirements by giving preference to Purchaser's orders. During the effectiveness of a Force Majeure Event, Purchaser may cancel or modify in whole or part any affected orders and elect to use other manufacturers, without any obligation or liability to the Manufacturer, by delivering written notice to Manufacturer during the effectiveness of such Force Majeure.

6.      Risk of Loss; Insurance.

6.1     Risk of Loss. Manufacturer shall bear the risk of loss of all Products sold hereunder until Purchaser and/or its designee has received delivery of such Products. Title and risk of loss or damage to Products shall pass to Purchaser at the time Purchaser and/or its designee has received delivery of such Products.

6.2     Insurance. Manufacturer agrees to obtain and maintain in full force and effect, a policy or policies of comprehensive general liability insurance, covering all of the Manufacturer's operations, insuring Manufacturer against liability for injury or damage to persons in amounts customary for the manufacturing industry. Such insurance shall be placed with companies reasonably acceptable to Purchaser, and shall name Purchaser as an additional insured party on each such policy and shall include a provision which provides for thirty (30) days notice of cancellation or termination. Manufacturer shall not cancel or reduce the limits or coverages of such insurance policies without the prior written consent of Purchaser or do or omit to do any act that may cause such insurance to be cancelled or reduced. Any circumstance that may give rise to a claim shall be reported to Purchaser not later than five (5) business days after such circumstance has come to the attention of Manufacturer].

7.      Inspection and Examination Rights; Manufacturer's Additional Responsibilities.

7.1     Manufacturer's right to inspect Purchaser's Books. To verify and insure Purchaser's compliance with the terms of this Agreement, including, without limitation, the fees payable pursuant to **Section 9.2**, Purchaser shall permit Manufacturer to inspect, upon reasonable notice and at reasonable times during normal business hours, Purchaser's books and records.

7.2     Purchaser's right to inspect Manufacturer's Books. To verify and insure Manufacturer's compliance with the terms of this Agreement, including, without limitation, the pricing of Products, Manufacturer shall permit Purchaser to inspect, upon reasonable notice and at reasonable times during normal business hours, Manufacturer's books and records.

7.3     Purchaser's right to inspect Manufacturer's Facilities. To verify and insure Manufacturer's compliance with the terms of this Agreement, the Purchaser shall have the right to inspect Manufacturer's manufacturing facilities during mutually agreed upon times to ensure that Manufacturer's manufacture of the Products is in compliance with applicable regulation and specifications. The right to inspect granted to Purchaser shall not be deemed as granting to Purchaser access to any trade secrets owned by Manufacturer.

8.      Restrictions on the Manufacturer's Activities.

8.1     Non-Competition. The Manufacturer agrees that it shall not, whether or not for compensation, directly or indirectly, individually or as an officer, director, shareholder, trustee, employee, consultant, advisor, partner, proprietor or otherwise, for a period commencing on the date hereof and ending 24 months after the end of the Term (the "**Restricted Period**"), without the prior written approval of the Purchaser (which approval may be withheld or delayed for any reason or for no reason) (1) other than pursuant to **Section 2** (i) participate or engage in the soliciting, or endeavoring to entice away, or sell any Products to, any person or entity who was a customer or client of the Purchaser at any time during the previous twelve months, or encouraging any such person or entity to use any Products which compete with the Purchaser's products; or (ii) assist any person or entity in any way to do, or attempt to do, anything prohibited by clause (i) above or (2) other than as permitted by **Section 2**, interfere with or harm the contractual or business relationships with any person or entity who was a vendor, supplier, customer, client, licensor, licensee or independent contractor of the Purchaser at any time during the previous twelve months or (3) sell (other than pursuant to **Section 2**) any Products. Additionally, the parties hereto may, from time to time, by separate agreement in writing, permit the sale to certain specific customers.

8.2     Breach; Injunctive Relief. If the Manufacturer commits a breach, or threatens to commit a breach, of any of the provisions of **Section 8.1**, the Purchaser shall have the following rights and remedies, each of which shall be independent of the others and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Purchaser under law or in equity:

(a)     Specific Performance. The right and remedy to have such provisions of this **Section 8** specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Purchaser and that money damages will not provide an adequate remedy at law; and in connection therewith the right to obtain, without notice to the Manufacturer and without the need to post any bond, a temporary restraining order, an injunction and any other equitable relief. Such right of injunctive relief shall be cumulative and in addition to whatever other remedies the Purchaser may have at law or in equity, including the right of the Purchaser to recover from the Manufacturer as set forth in subparagraph (b) below; and

(b)     Accounting. The right and remedy to require the Manufacturer to account for and pay over to the Purchaser all compensation, profits, monies, accruals, increments or other benefits (collectively "**Benefits**") derived or received by it as the result of any transactions constituting a breach of any of the provisions of **Section 8.1**, and the Manufacturer hereby agrees to account for and pay over such Benefits to the Purchaser.

8.3     Trade Secrets; Confidentiality. The Manufacturer recognizes and acknowledges that in connection with its providing Products to the Purchaser, it has had and will continue to have access to valuable trade secrets and confidential information of the Purchaser, including but not limited to customers lists; business methods and processes; marketing, promotion, sourcing, pricing, and financial information; and data and information relating to employees and consultants (collectively "**Confidential Information**"). Manufacturer agrees that during the Restricted Period, it, and its members, managers, officers, employees, agents, representatives and advisors shall not disclose any of such Confidential Information to any person or firm, except that disclosure of Confidential Information will be permitted (i) if such Confidential Information has previously become available to the public through no fault of the Manufacturer; (ii) if required by any court or governmental agency or body or as otherwise required by law; (iii) if necessary to establish or assert the rights of the Manufacturer hereunder against the Purchaser; or (iv) if expressly consented to by the Purchaser.

8.4     Severability and Construction.

(a)     The provisions of this **Section 8** are severable, and if any provision or any part of any provision of this **Section 8** is found to be invalid or unenforceable, the balance of that provision and the other provisions hereof shall be given full force and effect and remain fully valid and enforceable.

(b)     If any covenant, or any part of a covenant, contained in this **Section 8** is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, said provision shall then be enforceable.

(c)     The parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in this **Section 8** upon the courts of any state within the geographical scope of such covenants. In the event that the courts of any one or more of such states shall hold such covenants wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect in the courts of any other states within the geographical scope of such covenants the Purchaser's right to the relief for breaches of such covenants in such other states, the above covenants as they relate to each state being, for this purpose, severable into diverse and independent covenants.

8.5     Manufacturer agrees that any violation of Purchaser's rights under this Agreement, including, without limitation, to purchase Products from Manufacturer, and to sell and distribute Products, as set forth herein, will cause irreparable harm to Purchaser for which there is no adequate remedy at law and, in addition to any other right or remedy under applicable law, Purchaser shall be entitled to: (i) an injunction, including, without limitation, as applicable,

a mandatory injunction, without the posting of any bond, undertaking or security, enjoining or restraining Manufacturer from any violation or threatened violation of this Agreement, and Manufacturer hereby consents to the issuance of any such injunction; and (ii) an accounting and payment of all benefits, including, without limitation, all monies or other compensation received by Manufacturer in violation of this section; and (iii) nothing contained herein shall restrict or prevent Purchaser from seeking monetary damages for any such violation, including, without limitation, reimbursement for its attorneys' fees and other related costs which Manufacturer agrees would constitute a component of Purchaser's damages.

9. Services.

9.1 Purchaser hereby engages the Manufacturer and the Manufacturer accepts the engagement to provide all such back-office services, including all administrative and support services such as settlements, clearances, record maintenance, inventory and accounting, to the Purchaser from Manufacturer's facilities in China as Purchaser shall request from time to time during the Term; Purchaser shall not pay any additional amount to Manufacturer for such services as the amount to be paid for the supplies pursuant to Section 3 reflects the Manufacturer's provision of these services.

10. Representations and Warranties.

10.1 Manufacturer represents and warrants:

(a) It is duly organized and existing and in good standing under the laws of Hong Kong and has all requisite power and authority, limited liability company or otherwise, to conduct its business, to own its property, and to execute, deliver and perform all of its obligations under this Agreement;

(b) The execution and delivery of this Agreement by Manufacturer has been duly authorized by limited liability company proceedings and upon its execution and delivery shall constitute the legal, valid and binding obligation of Manufacturer, enforceable in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium and similar laws affecting the validity or enforcement of creditors' rights generally.

(c) The execution, delivery and performance of this Agreement by Manufacturer and the consummation by Manufacturer of the transactions contemplated herein and compliance by Manufacturer with the provisions hereof shall not violate any existing law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Manufacturer or its articles of organization or the provisions of any instrument or agreement to which Manufacturer is a party or is subject, or by which it, or its property, is bound or conflict with or constitute a default thereunder; and the execution, delivery and performance of this Agreement and the consummation of the transaction contemplated herein and compliance with the provisions hereof by Manufacturer shall not require the consent of nor the giving of notice to any party (including without limitation Manufacturer's lender, if any) other than any registration or filing with any governmental authority to the extent not previously obtained or made.

(d) All Products furnished to Purchaser shall at all times: (i) conform to Purchaser's specifications; (ii) be new and merchantable; and (iii) will be manufactured in a good and workmanlike manner, free from defect in materials and workmanship.

10.2 Purchaser represents and warrants:

(a) The execution and delivery of this Agreement by Purchaser has been duly authorized by proper limited liability company proceedings and this Agreement, upon its execution and delivery, shall constitute the legal, valid and binding obligations of Purchaser enforceable in accordance with its respective terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium and similar laws affecting the validity or enforcement of creditors' rights generally.

(b) The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated herein and compliance by Purchaser with the provisions hereof shall not violate any existing law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Purchaser or its articles of organization or its operating agreement or the provisions of any instrument or agreement to which Purchaser is a party or is subject, or by which it, or its property, is bound or conflict with or constitute a default thereunder; and the execution, delivery and performance of this Agreement and the consummation of the transaction contemplated herein and compliance with the provisions hereof by Purchaser shall not require the consent of nor the giving of notice to any party other than any registration or filing with any governmental authority to the extent not previously obtained or made.

11. Intellectual Property.

11.1 Copyrights and Other Intellectual Property. If Manufacturer, its employees or agents create copyrightable or trademarkable materials for Purchaser, or if Manufacturer or its employees or agents modify the Product drawings or the Products, such activities shall only be performed on Purchaser's behalf and shall constitute works made for hire. Manufacturer hereby assigns any rights in such designs, drawings and other materials and covenants that it will, at Purchaser's sole cost and expense, take all actions necessary to secure such rights from employees or other agents and to fully and effectively transfer all such rights to Purchaser.

11.2 Use of Intellectual Property. Manufacturer's use of any of Purchaser's intellectual property shall be limited to the scope of Manufacturer's activities specified in this Agreement. Manufacturer shall not acquire any right, title, or interest in any of Purchaser's intellectual property by virtue of this Agreement or the activities conducted pursuant to this Agreement. Manufacturer is strictly prohibited from using Purchaser's trademarks or trade names. Purchaser's use of any of Manufacturer's intellectual property shall be limited to the scope of Purchaser's activities specified in this Agreement. Purchaser shall not acquire any right, title, or interest in any of Manufacturer's intellectual property by virtue of this Agreement or the activities conducted pursuant to this Agreement. Purchaser is strictly prohibited from using Manufacturer's trademarks or trade names.

11.3   Return of Intellectual Property. Upon termination of this Agreement, (i) Manufacturer shall cease using Purchaser's intellectual property and shall, at Purchaser's option, return or destroy all copies of any materials containing such intellectual property and (ii) Purchaser shall cease using Manufacturer's intellectual property and shall, at Manufacturer's option, return or destroy all copies of any materials containing such intellectual property.

12.   Indemnification.

12.1   Indemnification by Manufacturer. Manufacturer agrees to protect, indemnify, defend and hold harmless Purchaser, its agents, employees, and affiliates (the "**Purchaser's Indemnified Parties**"), against all liability, loss, claims, suits, demands, damages or expenses whatsoever, including without limitation reasonable attorneys' fees and court costs ("**Purchaser's Damages**") arising out of, caused by, or relating to: (A) Manufacturer's misrepresentations or breach of any of its warranties, representations, or covenants contained herein; and (B) any negligence or wrongful act of Manufacturer and its agents and representatives, (C) Manufacturer's business and operations, its facilities, taxes, (D) claims brought against Manufacturer and (D) all costs and damages associated with a defective Product within the warranty period including, without limitation, all costs associated with or arising out of the inspection, repair and replacement of defective Products.

12.2   Indemnification by Purchaser. Purchaser agrees to protect, indemnify, defend and hold harmless Manufacturer, its agents, employees, and affiliates (the "**Manufacturer's Indemnified Parties**"), against all liability, loss, claims, suits, demands, damages or expenses whatsoever, including without limitation reasonable attorneys' fees and court costs ("**Manufacturer's Damages**") arising out of, caused by, or relating to: (A) Purchaser's misrepresentations or breach of any of its warranties, representations, or covenants contained herein; and (B) any negligence or wrongful act of Purchaser and its agents and representatives.

13.   Miscellaneous.

13.1   Governing Law. This Agreement shall be construed in accordance with the laws of the State of Florida and, where applicable, the laws of the United States.

13.2   Jurisdiction. All claims, disputes and controversies, if any, between Manufacturer and Purchaser arising out of or connected with or related to or incidental to the relationship established between them in connection with this Agreement, whether arising at law or in equity, in contract, tort, equity or otherwise, if pursued in court, shall be resolved only by State or Federal courts located in the city of Palm Beach located in the State of Florida.

13.3   Attorneys' Fees/Prevailing Party. In the event the parties litigate any dispute under this Agreement, the prevailing party shall receive from the non-prevailing party its reasonable costs and attorneys' fees as part of any judgment.

13.4   Merger. This Agreement, together with its exhibits, contains the entire understanding between Manufacturer and Purchaser with respect to its subject matter, and supercedes all previous oral or written agreements or understandings between them with respect thereto, and shall not be modified except by a writing signed by the party to be charged.

13.5   No Waiver. No waiver by either party of any breach of this Agreement by the other shall be deemed to be a waiver of any preceding or subsequent breach thereof. Any waiver must be in writing and executed by the waiving party.

13.6   Notices. Except as otherwise provided herein, all notices and other communications required or desired to be served, given or delivered hereunder shall be made in writing or by a telecommunications device capable of creating a written record and shall be addressed to the party to be notified (together with a copy as set forth below) at the respective addresses set forth above or, as to each party, at such other address as designated by such party in accordance herewith. Notice shall be deemed to have been duly given (i) if delivered personally or otherwise actually received; or (ii) if sent by an overnight delivery service for delivery on the following business day; or (iii) if mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested; or (iv) if sent by telecopy, with a copy sent by regular mail. Notice sent pursuant to clause (i) shall be deemed given on the date of receipt; notice given pursuant to clause (ii) shall be deemed given on the next business day after proper posting; notice given pursuant to clause (iii) shall be deemed given three business days after actual mailing provided return receipt is acknowledged; and notice given pursuant to clause (iv) shall be deemed given on the next business day after being telecopied.

13.7   Additional Notice. A copy of all notices shall be sent to Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, New York, New York 10022, Attn.: A. Mitchell Greene, Esq., Telecopier Number 212-956-2164.

13.8   Successors. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs and assigns.

13.9   Non-Assignability. Notwithstanding the foregoing, no party shall be permitted to assign this Agreement nor its rights hereunder without the prior written consent of the other, which may be given or withheld at the other's sole discretion. Any attempt to assign this Agreement without such consent shall be void.

13.10   Independent Contractors. Each party agrees it is and will be an independent contractor as to the other party and not an agent, employee, partner or joint venturer of or with the other party, except as may have been expressly provided for herein. Without limiting the foregoing, neither party nor any officer or employee of such shall have the right to bind, to make any representations or warranties on behalf of the other, to accept service of process, to receive notice, to perform anything such thing or act on behalf of the other party other than as expressly authorized at such other party's sole discretion, including in this Agreement.

13.11   Invalidity. If any provision herein is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect without being impaired or invalidated in any way.

13.12   Headings. Headings are for reference purposes only, and in no way define, limit, construe or describe the scope of extent of such section.

13.13   Monetary Exchange. Wherever in this Agreement any reference is made to money or dollars, it shall be deemed to be a reference to United States dollars.

13.14  Counterparts.  This Agreement may be executed in two or more counterparts and by telefacsimile signature, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document.  The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date and year above first written.

Manufacturer:
ERAN INDUSTRIES LTD

By: *[signature]*
Name: Ye Zeng Hui
Title: General Manager

Purchaser:
ERAN FINANCIAL SERVICES LLC

By: *[signature]*
Name: Shai Levidin
Title: CEO