UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-81386-BER

| | |
|---|---|
| ERAN FINANCIAL SERVICES LLC, a Florida limited liability company,<br><br>                        Plaintiff,<br><br>        vs.<br><br>ERAN INDUSTRIES LIMITED, a Belize entity; and YE ZENG HUI, an Individual,<br><br>                   Defendants/Counterclaimant. | **FIRST AMENDED COUNTERCLAIM, AND THIRD-PARTY COMPLAINT OF DEFENDANT ERAN INDUSTRIES LIMITED**<br><br>**(Jury Trial Demanded)** |
| ERAN INDUSTRIES LIMITED, a Belize entity,<br><br>               Third-Party Plaintiff,<br><br>     vs.<br><br>ERAN FINANCIAL SERVICES, LLC; SHAI LEVITIN and ERAN LOGISTICAL SERVICES, LLC,<br><br>             Third-Party Defendants. | |

Counterclaimant and Third-Party Plaintiff Eran Industries Limited ("Counterclaimant" or "EI Belize") brings this action against Eran Financial Services, LLC ("Counter-Defendant" or "EFS"), Shai Levitin, and Eran Logistical Services, LLC ("Eran Logistical," and collectively "Third-Party Defendants") for breach of contract, account stated, common law fraudulent inducement and fraudulent transfer under Fla. Stat. § 726.105 as follows:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) because this action is between a citizen of a foreign state and citizens of this state, with an amount in controversy in excess of $75,000, exclusive of interests and costs.

## THE PARTIES

2.      EI Belize is a Belize entity that also does business in China.

3.      EFS is a Florida limited liability company, and Shai Levitin is its principal chief executive officer who resides in Florida.

4.      Upon information and belief, the remaining Third-Party Defendants are Florida limited liability companies, which regularly conduct business in Florida on an ongoing basis, and whose members are citizens of Florida or, upon information and belief, another state in the United States.

## FACTS APPLICABLE TO ALL CLAIMS

5.      For over 9 years, EI Belize worked closely and in good faith with EFS pursuant to agreements to manufacture or acquire lighting products from companies in China for EFS to market and sell in the United States.

6.      Prior to that, persons affiliated with EI Belize originally worked with EFS through Eran Industries Ltd., which was a Hong Kong entity ("EI Hong Kong").  Those relationships span over twenty years.

7.      EI Hong Kong was deregistered as a legal entity under Hong Kong law on May 30, 2014.

8.      EI Belize was formed on or about August 9, 2012. After EI Hong Kong was deregistered, EI Belize supplied, manufactured, sourced, and/or sold products to EFS. The products were primarily LED lighting products that EFS resold to big box retailers and OEM/ODM customers in the United States.

9.      EFS and EI Belize also sold certain dyes, molds, and other machinery to customers ("Tooling") as needed to customize products made for them. The customers would generally own the Tooling that they paid for, not EFS or other Third-Party Defendants.

9709728

10.     At all relevant times, employees of EFS worked closely (sometimes in the same physical location) with EI Belize to coordinate the manufacture, marketing, and sale of lighting products.

11.     It has come to EI Belize's attention that EFS has asserted that its relationship with EI Belize is governed by a Supply and Services Agreement, attached hereto as Exhibit A.  Exhibit A is a forged document that was never executed by EI Hong Kong or EI Belize.

12.     Moreover, Exhibit A was never signed or effectuated by Mr. Ye Zeng Hui ("Mr. Ye"), the former principal of EI Hong Kong and current principal of EI Belize, whose name appears on the signature line of Exhibit A for EI Hong Kong.

13.     Upon information and belief, Defendants Shai Levitin and EFS forged Mr. Ye's signature on Exhibit A.

A.     **The Parties' Course of Dealing and Performance**

14.     Neither EI Hong Kong nor EI Belize had a comprehensive written contract with EFS.

15.     The parties' contracts are evidenced by various documents and by EI Belize supplying, manufacturing, sourcing and delivering lighting products and Tooling to EFS' end-customers on EFS' behalf, or by delivering lighting products directly to EFS either for its own inventory, or for further shipment to specific customers.

16.     EFS, EI Belize and/or persons associated with them had an extremely close relationship for decades and, as a result, EFS and EI Belize often dispensed with formalities.

17.     Because of their close relationship and course of dealing, EFS and EI Belize did not create written purchase orders between themselves for many contracts.

9709728

18.     EFS would often forward purchase orders between EFS and its end-customers directly to EI Belize.

19.     EFS would also authorize its end-customers to forward purchase orders they issued to EFS directly to EI Belize for fulfillment.

20.     EI Belize is in possession of these end-customer purchase orders, which are offers by EFS for EI Belize to procure and deliver lighting products on EFS' behalf for the prices stated in the individual end-customer purchase orders.

21.     EI Belize would accept these offers by manufacturing or procuring the underlying goods and delivering them directly to the end-customer, as indicated in the end-customer purchase order.

22.     EI Belize would then invoice EFS for the amount agreed to in the end-customer purchase order.

23.     After EFS collected the face amount of the end-customer purchase order from the end-customer, EFS agreed to pay EI Belize that amount, less a percentage retained by EFS.

24.     The percentage EI Belize and EFS agreed to compensate EFS for these orders was generally between 6% and 25% and varied based on the customer, type of product, and volume, as well as warehousing, shipping, and other costs.

25.     The specific amounts EFS agreed to were delineated in writing on the numerous invoices issued and delivered to EFS.

26.     In general, the practice for goods ordered by EFS for its own inventory and for certain end-customers was different. The parties created and approved written purchase orders among themselves for these orders.  For example, The Home Depot is a major customer for which EI Belize procured products.  Occasional exceptions notwithstanding, EFS and EI Belize created

and agreed to purchase orders between them for goods manufactured or procured for The Home Depot, regardless of whether EI Belize first sent those goods to EFS or directly to The Home Depot.

27.     EI Belize did not pay EFS a percentage for goods ordered for its own inventory, for further shipment by EFS to its end-customers, or for which EFS and EI Belize negotiated and agreed to a purchase order among themselves.  Under these circumstances, EFS agreed to pay EI Belize for the full value of the order as set forth in the purchase order or invoice.

28.     The parties also entered into contracts for Tooling.

29.     Sometimes EFS and EI Belize created and agreed to a written purchase order or other written instrument for Tooling among themselves.  Other times, EFS forwarded an end-customer purchase order for Tooling to EI Belize for fulfillment and then EI Belize invoiced EFS less an agreed percentage, as it did for lighting products.  Still other times, EI Belize would merely invoice EFS at an agreed price for the Tooling after it procured and delivered the Tooling.

30.     In consideration of the parties' long-term relationship, EFS' procurement of customers and in furtherance of their ongoing business dealings, EI Belize periodically laid out expenses for EFS at its request. EI Belize would invoice EFS for these expenses, including, but not limited to, for payment to employees working closely with the company, or for travel-related expenses.

31.     Regardless of the practice between the parties in forming their contracts, EFS was generally agreed to pay EI Belize on net 60 day terms based off the ship date and bill of lading for goods, or as invoiced for expenses.

32.     In addition, EI Belize (and prior to it, EI Hong Kong) paid a commission to Shai Levitin.

9709728

33.    These payments were disbursed monthly, and the total annual amounts ranged from $1.5 million to $2.0 million in recent years.

34.    At Shai Levitin's direction, his commissions were also paid to Eran Logistical, his wife, his mother, Kent Farrington LLC, and Dan Holdings Limited (a Hong Kong-based company owned by Shai Levitin).

35.    For years, the foregoing arrangement worked well for the parties. For the period August 9, 2016 to the date of this action, the parties did $130,266,940.16 in sales.

36.    Starting in late 2018, EFS began to fall behind on its payments owed to EI Belize.

37.    EFS made periodic payments, but by the end of December 2020, EI Belize's CPA advised that EFS had accrued a balance of $12,366,316.55.

38.    By the end of April 2021, and despite additional periodic payments, the unpaid invoices due and owing from EFS totaled $18,316,115.27.

**B.    The 545 Contracts at Issue in this Case**

39.    At issue in this case are 545 contracts formed between EI Belize and EFS based on the above-described course of dealing and performance.

40.    These 545 contracts are evidenced by some compilation of end-customer purchase orders, direct purchase orders between EFS and EI Belize, invoices, bills of lading, packing lists or other shipping documents, communications and/or customer invoices.

41.    While the parties had various arrangements by which they offered and accepted contracts for the sale of lighting products and Tooling, the final written terms of the parties' 545 contracts are fully set forth in 545 separate written invoices, which were sent to EFS.

9709728

42.     The invoices are attached hereto as Exhibit B (the "Invoices").[1]

43.     Each Invoice describes, as applicable, (1) the unit price, quantity, and identification number of the goods ordered; (2) the date, method, terms, and destination of shipping; (3) the corresponding purchase order number; (4) the date and identification number of the Invoice; (5) EFS' percentage due and/or (6) the expenses to be reimbursed.  *See* Exhibit B.

44.     The Invoices were issued by EI Belize.  The Invoices sometimes state they were issued by "Eran Indust*rial* Ltd."   EI Belize often operated under this pseudonym for the purposes of Invoicing EFS.

45.     All the Invoices expressly direct payment to EI Belize on the Invoice (*i.e.* Eran Industries Limited).

46.     EFS was sent each and every one of the Invoices, but never timely objected in writing to any of the terms or the amounts claimed in the Invoices.

47.     All 545 contracts, in addition to the Invoices, are evidenced by other documents depending on the parties' course of dealing that state the terms of the parties' contracts and include, as applicable: (1) EFS' end-customer purchase orders in EI Belize's possession based on which it sold and delivered goods to those customers on EFS' behalf; (2) purchase orders between the parties; (3) bills of lading; (4) packing lists and other shipping documents; (5) purchase orders for Tooling; (6) Tooling specifications; (7) support for reimbursements; and/or (8) communications.

48.     These documents are annexed hereto as Exhibit C.[2]

---

[1] Among the Invoices are 20 "credit notes," which represent monies previously credited back to EFS against the total amount of the Invoices.

[2] Exhibit C is organized by Invoice number, with each set of documents being preceded by a slipsheet stating the corresponding Invoice number in Exhibit B.  For efficiency, several sets of documents are combined into a single file for the purposes of e-filing.  Each filed sub-exhibit has a cover page stating its contents.

9709728

49.     Under the parties' agreements, payment was not due until after shipment. Therefore, the Invoices often cover multiple end-customer purchase orders or purchase orders between the parties, or parts thereof.

50.     The overwhelming majority of the 545 contracts at issue in this case are for the sale of lighting products or Tooling that were manufactured or procured by EI Belize and sold and delivered to EFS' end-customers for EFS' account, or to EFS itself.

51.     A small number of the 545 contracts are for the reimbursement of expenses.

52.     *There are no unfulfilled contracts at issue.*  In all circumstances, EI Belize fulfilled all its obligations by procuring and delivering goods or outlaying the expenses.

53.     EFS breached these contracts by failing to pay the amounts due for these goods and expenses specified in the Invoices.

**C.      Loans Between EI Belize and Eran Logistical, and Shai Levitin's and Eran Logistical's Fraud on EI Belize**

54.     In consideration of the parties' long-term relationship, EFS' procurement of customers and in furtherance of their ongoing business dealings, EI Belize not only continued to do business with EFS despite its failure to timely pay the Invoices, but also, at Shai Levitin's request, loaned Eran Logistical a total of $ $6,891,550, from December 2019 through April 2021.

55.     To induce EI Belize to make $1.1 million worth of these loans, and to continue being supplied products despite the excessive aged accounts receivables, Shai Levitin represented over the phone to Mr. Ye on August 20, 2020 that:  (1) he had secured new lender financing, (2) he would use that financing the repay EI Belize's $1.1 million loan to Eran Logistical, and (3) he and his entities had the ability to repay this loan and EFS' unpaid Invoices.

56.     Dan Levitin confirmed this conversation by email on August 20, 2020, a copy of which is annexed hereto as Exhibit D.

9709728

57.     EI Belize lent Eran Logistical this money in good faith.  In early 2021, Shai Levitin began competing directly with EI Belize by locating other lighting suppliers and doing business with them. It is apparent that despite Mr. Levitin's representations to the contrary, EFS and Eran Logistical had no intent to pay the amounts they owed to EI Belize.

**D.      The Parties Terminate their Relationship**

58.     Despite EFS' non-payment and Eran Logistical's and Shai Levitin's fraud, in order not to disrupt ongoing operations and unfulfilled customer orders, EI Belize attempted a number of resolutions with EFS and Shai Levitin.

59.     For example, EI Belize requested a payment plan from EFS and attempted to continue doing business with EFS on revised payment terms.

60.     EI Belize also proposed to resolve its dispute with EFS by dividing the parties' U.S. customer base between them.

61.     The parties continued to discuss a resolution through April 2021, but they could not reach an agreement to resolve EFS' past due debts. Accordingly, in May 2021, EI Belize ceased paying commissions to Shai Levitin and ceased doing business with EFS.

62.     On July 30, 2021, Dan Levitin, on behalf of a company called the Eran Group, wrote to EI Belize alleging the existence of a 2011 written agreement between EI Hong Kong and EFS. The letter claimed EFS was being overcharged and wanted to review EI Belize's books. Neither EI Belize nor EI Hong Kong executed this agreement.

63.     Subsequently, EI Belize learned that EFS filed this August 9, 2021 litigation alleging EI Belize breached a 2011 written contract, which is Exhibit A.  As noted, the alleged signature on Exhibit A is a forgery.

9709728

## COUNT ONE
### Breach of Contract Against Eran Financial Services, LLC

64.     EI Belize repeats and realleges allegations 1 through 53 and 58-63 as if fully set forth and incorporated herein.

65.     Under Fla. Stat. § 672.204(1), a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

66.     Under Fla. Stat. § 672.201(2) a contract is formed between merchants if, within a reasonable time, a writing confirming the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, unless written notice of objection to its contents is given within 10 days after it is received.

67.     Under Cmt. 2 of Fla Stat. § 672.305: "Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists."

68.     Under Florida common law, "A contract implied-in-fact is . . . based on an implicit promise, one that is inferred in whole, or in part, from the parties' conduct."  See Tracfone Wireless, Inc. v. Simply Wireless, Inc., 275 F. Supp. 3d 1332, 1334 (S.D. Fla. 2017).

69.     EFS and EI Belize are both merchants under the UCC.

70.     EFS and EI Belize entered into 545 contracts under the UCC and Florida common law, predominantly for the sale of lighting products and Tooling, which are both goods.  A small portion of these contracts were formed under Florida common law and are for the reimbursement of expenses.

71.     The 545 contracts were formed according to the parties' nearly decade-long course of dealing, including, but not limited to, as follows.

9709728

72.     EFS offered for EI Belize to manufacture or procure various lighting products by delivering or authorizing its customers to deliver an end-customer purchase order directly to EI Belize that the end-customer originally issued to EFS.  EI Belize manufactured and delivered the goods underlying the end-customer purchase order as directed therein.  EI Belize then Invoiced EFS for the face amount of the end-customer purchase order.  EFS agreed to pay the amount of the end-customer purchase order to EI Belize, less a percentage as designated in the various Invoices.  The specific terms of these contracts are set forth in Exhibits B and C, with the final terms reflected in the Invoices respecting each individual transaction in Exhibit B.

73.     EFS and EI Belize agreed to written purchase orders among themselves for lighting products.  The goods underlying these orders were manufactured and delivered either: (1) to EFS for its own inventory; (2) to EFS for further shipment to an end-customer; and/or (3) directly to the end customer.  After EI Belize procured and shipped the goods, EI Belize Invoiced EFS for the amount agreed. The specific terms of these contracts are set forth, as applicable, in Exhibits B and C, with the final terms reflected in the Invoices respecting each individual transaction in Exhibit B.

74.     EFS and EI Belize entered contracts for the sale of Tooling to end-customers. Either:  (1) EFS and EI Belize entered into purchase orders among themselves for Tooling, and EI Belize Invoiced EFS for same after it procured the Tooling; (2) EFS forwarded end-customer purchase orders to EI Belize for Tooling and EI Belize Invoiced EFS for same, less a percentage agreed to and designated in the Invoices, after it procured and delivered the Tooling; or (3) EI Belize procured Tooling at EFS' request and then it Invoiced EFS for an agreed amount.  The specific terms of these contracts are set forth, as applicable, in Exhibits B and C, with the final terms reflected in the Invoices respecting each individual transaction in Exhibit B.

9709728

75.     In consideration of the parties' long-term relationship, EFS' procurement of customers and in furtherance of their ongoing business dealings, EI Belize laid out certain expenses for EFS for which it Invoiced EFS.  The specific terms of these contracts are set forth, as applicable, in Exhibits B and C, with the final terms reflected in the Invoices respecting each individual transaction in Exhibit B.

76.     Documents evidencing the 545 contracts at issue in this litigation that conform to one of the foregoing courses of dealing, or other similar practices between the EFS and EI Belize, are annexed hereto as Exhibit C.

77.     Independent from the foregoing courses of dealing, under the UCC, EI Belize's receipt of end-customer POs from EFS, or at the direction of EFS, its instruction to EI Belize that said orders be fulfilled and EI Belize's fulfillment of those orders is conduct sufficient to create a contract, including for both lighting products and Tooling. *See* Exhibit C.

78.     Independent from the foregoing courses of dealing, under the UCC, EFS' sending purchase orders to EI Belize under its cover for the goods listed therein and EI Belize's fulfillment of those orders is conduct sufficient to create a contract under the UCC, including for both lighting products and Tooling.  *See* Exhibit C.

79.     Independent from the foregoing courses of dealing, under the UCC, EFS' and EFS' end-customers' receipt and acceptance of goods without timely objection that were sold and delivered by EI Belize, and for which EI Belize sent Invoices to EFS that EFS did not object to, is conduct sufficient to form a contract under the UCC.  *See* Exhibits B and C.

80.     EFS did not issue a written notice of objection to any confirmatory documents within 10 days, or otherwise.  *See* Exhibits B and C.

9709728

81.     All goods at issue were sold and delivered to EFS or to EFS' end-customers at EFS'
specific instance and request.

82.     All Tooling at issue were sold and delivered by EI Belize at EFS' specific instance
and request.

83.     All expenses at issue were duly paid by EI Belize at EFS' specific instance and
request.

84.     EI Belize performed all of its obligations under the parties' contracts by fulfilling
end-customer purchase orders and causing the products to be shipped directly to said customers
which, upon information and belief, accepted the goods without objection. Upon information and
belief, the customers paid the full amount for the goods directly to EFS.

85.     EI Belize performed all of its obligations under the parties' contracts by fulfilling
purchase orders placed by EFS and causing these products to be shipped directly to EFS or to end-
customers designated by EFS, who accepted the goods without objection.

86.     EI Belize performed all its obligations under the parties' contracts, as applicable,
by procuring and delivering Tooling for EFS as directed by it, which was accepted without
objection.

87.     EI Belize performed all its obligations under the parties' contracts, as applicable,
by laying out certain expenses for EFS.

88.     The final terms of all the parties' 545 contracts are in the Invoices, which are
annexed hereto as Exhibit B.  Each Invoice sets forth, as applicable:  (1) the unit price, quantity,
and identification number of the goods ordered; (2) the date, method, terms, and destination of
shipping; (3), the corresponding purchase order number; (4) the date and identification number of

9709728

the Invoice; (5) EFS' percentage due from customer purchase orders; and/or (6) the expenses to be reimbursed.

89.     EFS breached its contracts with EI Belize, by failing and refusing to remit $18,316,115.27 due and owing to EI Belize for the sale of lighting products, Tooling or for the payment of expenses as set forth in the Invoices, and related documents.  *See* Exhibits B and C.

90.     Based on EFS' breach of contract, EI Belize has suffered damages in excess of $18,316,115.27, plus, pre- and post-judgment interest in an amount to be determined at trial.

## COUNT TWO
### Account Stated Against Eran Financial Services, LLC

91.      EI Belize repeats and realleges allegations 1 through 53 and 58-63 as if fully set forth and incorporated herein.

92.     EI Belize has sold lighting products and Tooling to, and paid expenses for, EFS pursuant to an open book account.  EI Belize made periodic payments against the account, the last one being on March 19, 2021.  However, as of April 2021, EFS owed EI Belize a total balance of $18,316,115.27.

93.     EI Belize routinely issued, sent and delivered Invoices to EFS, which show the amount due for the sale of lighting products and Tooling, or the amount to be reimbursed for expenses, and contain all other material terms of the parties' contracts.  (*See* Exhibit B.)

94.     EFS never disputed the Invoices.

95.     Accordingly, an account has been stated as between EI Belize and EFS in the amount of $18,316,115.27.

96.     EI Belize demanded that EFS pay the account.

97.     EFS, however, failed and refused to pay the balance due and owing to EI Belize.

9709728

98.     Based on the foregoing, EI Belize has suffered damages in excess of $18,316,115.27, plus, pre- and post-judgment interest in an amount to be determined at trial.

## COUNT THREE
### Breach of Contract Against Eran Logistical Services, LLC

99.     EI Belize repeats and realleges allegations 1 through 63 as if fully set forth and incorporated herein.

100.    Florida law recognizes oral loan agreements as valid, provided the oral loan complies with the standard requirements for contracts. *See Bell v. Bailey*, 639 So. 2d 1063, 1064 (Fla. 3d DCA 1994); *Marshall v. Smith*, 714 So. 2d 669 (Fla. 4th DCA 1998).

101.    In consideration of the parties' long-term relationship, EFS' procurement of customers and in furtherance of their ongoing business dealings, EI Belize agreed to make loans to Eran Logistical at 0% interest and payable upon demand by EI Belize after a reasonable time had passed from disbursement of the loan.

102.    EI Belize disbursed $5,791,550 worth of loans under the foregoing terms to Eran Logistical as follows:

      (a)     on December 19, 2019, in the amount of $875,000;

      (b)     on April 7, 2020, in the amount of $1,000,000;

      (c)     on June 12, 2020, in the amount of $935,000;

      (d)     on October 15, 2020, in the amount of $481,550;

      (e)     on October 29, 2020, in the amount of $500,000;

      (f)     on November 6, 2020, in the amount of $500,000;

      (g)     on November 20, 2020, in the amount of $500,000; and

      (h)     on April 6, 2021, in the amount of $1,000,000.

9709728

103.    In addition, in consideration of the parties' long-term relationship, EFS' procurement of customers and in furtherance of their ongoing business dealings, EI Belize agreed to loan Eran Logistical an additional $1.1 million payable upon the sooner of EI Belize obtaining bank financing or demand, after a reasonable time had passed.  The $1.1 million loan was disbursed in installments on August 24, 2020, in the amount of $275,000; on August 31, 2020, in the amount of $275,000; on September 7, 2020, in the amount of $275,000; and on September 14, 2020, in the amount of $275,000 (the "$1.1 Million Loan").  *See also* Exhibit D.

104.    EI Belize fulfilled all its obligations under its loan agreements with Eran Logistical by disbursing the loan funds to Eran Logistical and waiting for a reasonable time to demand repayment.

105.    Upon information and belief, either Eran Logistical failed to obtain bank financing or had no intent to obtain bank financing or use the funds to pay EI Belize.

106.    After a reasonable period of time, EI Belize demanded repayment of the all the loans.

107.    Despite demand, Eran Logistical has failed to repay any loan, or portion thereof.

108.    Based on the foregoing, Eran Logistical has breached its loan contracts with EI Belize.

109.    EI Belize has been damaged by Eran Logistical's failure to repay the loans in the principal amount of $6,891,550, plus, pre- and post-judgment interest in an amount to be determined at trial.

## COUNT FOUR
### Common Law Fraudulent Inducement against Shai Levitin and Eran Logistical Services

110.    EI Belize repeats and realleges allegations 1 through 63 as if fully set forth and incorporated herein.

16

9709728

111.    On August 20, 2020 Shai Levitin, for himself and on behalf of Eran Logistical, knowingly and falsely represented to Mr. Ye over the phone and in his capacity as principal of EI Belize, (1) that Eran Logistical was getting private and bank financing; (2) that if EI Belize lent Eran Logistical $1.1 million, Eran Logistical would use the proceeds of the new bank financing to pay off the $1.1 Million Loan; and (3) that EFS had the ability to repay the previously outstanding amounts owed to EI Belize.

112.    By email dated August 20, 2020, which references the conversation between Mr. Ye and Shai Levitin, Dan Levitin, on behalf of Eran Logistical, confirmed Shai Levitin's false statements to Mr. Ye, and Machine Tsian, stating "Per Mr. Ye['s] & Shai['s conversation] earlier today, each week we will need to transfer $275k/week to ELS [Eran Logistical] . . . once we are concluded with the bank project ELS will transfer funds back to EI [Belize]."  (*See* Exhibit D).

113.    Upon information and belief, such statements by Shai Levitin were false and known to be false when made; Eran Logistical had no present intent to procure bank financing, or, even if it did, it had no intent to use those funds to repay the $1.1 Million Loan from EI Belize.

114.    Based on these misrepresentations, Shai Levitin induced EI Belize to lend Eran Logistical $1.1 million at zero interest rate, which was disbursed in $275,000 installments on August 24, 2020; August 31, 2020; September 7, 2020; and September 14, 2020.

115.    Given the parties' long-term relationship, EI Belize reasonably relied on Shai and Dan Levitin's representations on behalf of Eran Logistical in agreeing to make the $1.1 Million Loan to Eran Logistical.

116.    Had EI Belize known that Shai and Dan Levitin had no intent for Eran Logistical to obtain bank financing or use those funds to pay the $1.1 Million Loan, EI Belize would not have made the $1.1 Million Loan to Eran Logistical at zero interest.

9709728

117.     EI Belize has been damaged by Shai Levitin's and Eran Logistical's fraud in an amount to be determined at trial, but believed to be no less than $1.1 Million.

**COUNT FIVE**
**Fraudulent Transfer Under Fla. Stat. § 726.105 against Eran Financial Services, LLC, Eran Logistical Services, LLC, and Shai Levitin**

118.     EI Belize repeats and realleges each and every allegation set forth in paragraphs 1 through 63 as if fully set forth and incorporated herein.

119.     Eran Logistical is a shell company controlled by Shai Levitin and/or EFS.

120.     While being indebted to EI Belize, EFS, at the behest of Shai Levitin, diverted millions of dollars of assets from EFS to Mr. Levitin's other companies and related entities with the intent to shield EFS against collection from EI Belize and to render it judgment proof.

121.     Upon information and belief, EFS was insolvent and/or Shai Levitin caused it to become insolvent by, for example, directing commission payments be made to Eran Logistical, Shai Levitin's wife, Shai Levitin's mother, Dan Holdings Limited, and Kent Farrington LLC, instead of the EFS.

122.     Shai Levitin directed these transfers without EFS receiving a reasonably equivalent value in exchange and/or for no consideration.

123.     Eran Logistical, through its principal Dan Levitin, aided and abetted these fraudulent transfers by acting as the transferee.

124.     EI Belize has been damaged by these fraudulent transfers in an amount to be determined at trial.

**WHEREFORE**, EI Belize requests judgment as follows:

a.     For its breach of contract and account stated claims against Eran Financial Services, LLC in the amount of $18,316,115.27;

9709728

b.      For its breach of contract claim against Eran Logistical Services, LLC in the amount

of $6,891,550;

c.      For its common law fraudulent inducement claim against Shai Levitin and Eran

Logistical Services, LLC, actual and punitive damages in an amount to be determined at trial, but

believed to be no less than $1.1 million;

d.      For its fraudulent transfer claim pursuant to Fla. Stat. § 726.105 against Eran

Financial Services, LLC, Eran Logistical Services, LLC, and Shai Levitin in an amount to be

determined at trial; and

g.      For pre-judgment interest, costs, and expenses, including reasonable attorneys'

fees, and such other and further relief as the Court deems just and proper.

SILLS CUMMIS & GROSS P.C.
101 Park Avenue, 28th Floor
New York, New York 10178
(212) 643-7000

By: /s/  *Matthew P. Canini*
      MATTHEW P. CANINI
      mcanini@sillscummis.com

      TRENT S. DICKEY
      tdickey@sillscummis.com
      *Admitted Pro Hac Vice*

FOWLER WHITE BURNETT
Brickell Arch
1395 Brickell Avenue, 14th Floor
Miami, Florida 33131
(305) 789-9200

By: /s/  *Alexandra L. Tifford*
      ALEXANDRA L. TIFFORD
      atifford@fowler-white.com

Dated:  June 13, 2023

9709728

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2023, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Matthew P. Canini
Matthew P. Canini

## **SERVICE LIST**

Paul J. Schwiep, Esq.
2601 South Bayshore Drive, PH-l
Miami, Florida 33133
Email : PSchwiep@coffeyburlington.com

9709728